PRICE, Judge.
This is an appeal from a declaratory judgment interpreting the term “home-place” in a legacy as including only a residence and yard and not other acreage contiguous thereto.
Nannie Poole Cardone, a resident of Caddo Parish, Louisiana, died on October 8, 1970, leaving an estate inventoried at $328,038.66. Decedent left a last will and testament dated May 3, 1966, in which she made certain special legacies and named a niece, Ada D. Pickering, and her husband, George R. Pickering, residuary legatees. There are no forced heirs. The special legacy which gives rise to this litigation was to another niece, Marjorie Scott, and reads as follows:
“Third. I give, devise and bequeath to Marjorie Scott, Bossier City, Louisiana, my niece, my homeplace on the Moor-ingsport Road, Caddo Parish, Louisiana, where I am now living, with all furniture, furnishings, equipment and appliances therein contained and used in connection therewith.”
George Pickering, the executor named in the will, notified Marjorie Scott (one and the same as Margaret Scott Dordan Campbell) that she was to receive as her legacy the residence with its contents and the fenced yard surrounding same.
Mrs. Campbell filed this action, alleging the “homeplace” of decedent was comprised of not only the residence and yard, and area of 0.31 acres, but an additional 114 contiguous acres of land surrounding the residence which had been used by decedent and her husband for farming purposes for many years. Plaintiff requests she be sent into possession of this entire unit under the terms of her legacy. Should the legacy include the 114 acres, it has a value of $52,000, whereas if it does not include this acreage, it is valued at $8,500.
As this dispute does not affect the other special legacies made by decedent, the matter was contested only by Mr. and Mrs. Pickering, the residuary legatees.
*340 The trial judge, after hearing evidence submitted by both parties relating to what the term “homeplace”' meant to the testator, concluded it referred only to the residence and yard containing an area of 0.31 acres and judgment was rendered recognizing plaintiff as entitled to only this property-
On this appeal plaintiff contends the trial court erred in resorting to extrinsic evidence to determine the intent of the testator which in effect amounted to the rewriting of the will contrary to the plain words used by the testator in expressing her intent. In effect, plaintiff is saying the term “homeplace” has such an accepted meaning that it cannot be said to be ambiguous, thus it is unnecessary to go beyond the terms of the will to determine the intent of the testator.
The primary issue to be resolved is whether the term “homeplace” as used by the testator is ambiguous. That is to say, would this phrase signify different meanings to different people. And more particularly, in light of the background of this particular decedent, could it be said that it is unclear from the language used by her in confecting the legacy to the plaintiff whether she intended to leave only the portion of her real estate actually being used as a residence or intended to include all of her land contiguous thereto ?
We think the term “homeplace” as used by the testator in her will is ambiguous. Therefore, there must be resort to extrinsic evidence to determine the testator’s intent.
The law relating to the use of extrinsic evidence in seeking the intent of the testator is summarized by the Supreme Court in Giroir v. Dumesnil, 248 La. 1037, 184 So.2d 1 (1966) as follows:
“We agree with defendants that testamentary dispositions can be made only in writing. LSA-C.C. Art. 1576; Succession of Shows, 246 La. 652, 166 So.2d 261; Succession of Rusha, supra. 158 L.A. 74, 103 So. 515. We also agree that when a will is free of ambiguity extrinsic evidence of the testator’s intention must be rejected. ‘Candles are not to be lighted when the sun shines brightly.’ Succession of Maginnis, 158 La. 815, 104 So. 726; Succession of Rusha, supra; Theall v. Theall, 7 La. 226.
“When, however, the language of a will is ambiguous, resort must be had to all circumstances which may aid in ascertaining the testator’s intention. LSA-C.C. Art. 1715; Succession of Smart, 214 La. 63, 36 So.2d 639; Succession of Montegut, 211 La. 112, 29 So. 2d 583; Miller v. Hirsch, 110 La. 259, 34 So. 435.
“Article 1715, LSA-C.C. provides:
‘When, from the terms made use of by the testator, his intention can not be ascertained, recourse must be had to all circumstances which may aid in the discovery of his intention.’
“In Succession of Smart, supra, this Court succinctly stated the rule as follows :
* * * ‘Where there is ambiguity in the description of the legatee, or the thing which the testatrix intended to bequeath, or the quantum or portion of the legatee, or where there is doubt as to the sense in which the words are used by the testatrix, resort may be had to extrinsic evidence. In fact, all circumstances throwing any light on the testatrix’s intention must be considered. Revised Civil Code, Articles 1714, 1715 and 1716. Succession of Montegut, 211 La. 112, 29 So.2d 583.’
“When a will is ambiguous, the court uses extrinsic evidence to determine what the words of the testator as written actually mean. The evidence is used to resolve ambiguity, not to rewrite the will *341 or do violence to its terms. The court seeks to lay bare the intention of the testator. LSA-C.C. Arts. 1712, 1715.”
The record shows decedent and her husband, Frank R. Cardone, who died in 1963, owned the 114 acre tract in dispute for over 45 years. For many years Mr. Car-done operated a small rural grocery in a building situated on the tract. The earnings from his business were successfully used to make mortgage loans and over a period of years his ownership of notes receivable was very substantial. Mr. Car-done used the acreage he had acquired surrounding his home, as well as a small tract lying across the Mooringsport Road, for pasturing cattle.
In the latter years of the Cardones’ life they both fell into ill health and they ceased operating the store. At the request of Mr. and Mrs. Cardone, in the year 1960 Mr. and Mrs. Pickering moved from California to Shreveport to help take care of the Cardones, who had no children. They moved into a house built for them by Car-done and undertook to see after the personal needs of the elderly couple. Pickering took over the care and management of Cardone’s cattle and attended to the collection of notes and other financial affairs. After Mr. Cardone passed away, in response to Mrs. Cardone’s suggestion, Pickering purchased the cattle from her and was given all farming equipment used in connection with that operation. The Pick-erings continued to administer to all the personal needs and desires of Mrs. Car-done until her death in 1970.
Mr. and Mrs. Pickering testified that prior to giving up their home and business in California and moving to Shreveport they had an understanding with the Car-dones to the effect that the Cardones would will their estate one to the other and that the survivor would leave the entire estate to the Pickerings. Mrs. Cardone’s promptness in making a will immediately after her husband’s death, leaving everything to the Pickerings, corroborated their testimony that such an understanding had been made between these parties. There is no evidence of any disagreement or any change in the relationship existing between the Pickerings and Mrs. Cardone during the entire time she was looked after and cared for by them.
Shortly after the death of Mr. Cardone in 1963, Mrs. Cardone executed a will before her attorney, Otis Bullock, leaving her entire estate to George and Ada Pickering. Approximately three years later she appeared before her same attorney and prepared the testament now under consideration in which she continued the Pickerings as residual legatees but made three special legacies, one to her sister for $10,000, one to Mrs. Pickering for $10,000, and the legacy to plaintiff.
Seven persons with whom Mrs. Cardone discussed the intended disposition of her property testified that she told them that she intended to leave the land to the Pick-erings and the house and furniture to plaintiff. These people include three neighbors, two former employees of the Cardones, and Mr. and Mrs. Pickering. There was only one witness from whose testimony it might be inferred that by the use of the words “homeplace” Mrs. Car-done intended for plaintiff to receive all of the land adjacent to the house. This witness testified that after Mr. Cardone died, Mrs. Cardone told him that she was going to leave her money to the Pickerings and her homeplace to plaintiff, and on another occasion, when talking about her antique furniture, Mrs. Cardone said that she was leaving all of this to plaintiff. The testimony of the attorney who assisted in the preparation of the will was not available because he predeceased Mrs. Cardone. Moreover, it is apparent from the testimony that decedent’s primary concern in modifying her previous will was the desire to leave plaintiff her antique furniture and to *342 provide plaintiff with a house to live in since plaintiff was living in an apartment at the time the will was made. From the testimony we glean that Mrs. Cardone had a special affection for her antique furniture and yard, an affection shared by plaintiff. To say that Mrs. Cardone intended to leave plaintiff anything more than the house, its contents and the yard would be contrary to her actions and statements.
There are apparently no Louisiana cases interpreting the term “homeplace”. We are cited the case of Succession of Davis, 178 So.2d 481 (La.App.1st Cir. 1966) and several cases from other jurisdictions in which a legacy of a “home” or “house” was construed to include additional land used in connection therewith. We are in accord with the observation made by appellant’s counsel in brief that the common test applied in all of the cited cases is to ascertain which lands the testator treated as a unit for utility of purpose. See 38 A.L. R.2d 840 for examples.
It is clear from the evidence that Mrs. Cardone was primarily interested in her house and surrounding yard. After her husband’s death in 1963 she limited her interest in and use of her property to the residence and yard. This is evidence by the fact that she turned over the use of all the pasture land to Pickering and sold or gave him all the cattle or equipment pertaining to the farming operation. She derived no income or rent from its use by Pickering.
We think the preponderance of the evidence shows that Mrs. Cardone intended the term “homeplace” to mean her house and fenced yard, the only portion of her immovable property being utilized by her as a unit.
For the foregoing reasons the decision of the trial court is affirmed at appellant’s cost.