369 So.2d 1143 (1979)
In the Matter of the Succession of Anna Lusk JONES.
No. 12461.
Court of Appeal of Louisiana, First Circuit.
March 5, 1979.
Rehearing Denied April 16, 1979.
*1145 Charles H. Dameron, Baton Rouge, of counsel, for Testamentary Executrix-appellant Jessie Lee Lusk Black well.
Stephen Dart, St. Francisville, of counsel, for defendant-appellant Jefferson Lusk Smith.
William H. Mouton, Lafayette, of counsel, for defendant-appellant Jessie Lee Lusk Delahoussaye.
C. N. Malone, Baton Rouge, of counsel, for defendant-appellant Alice Louise Lusk Johnson and Ethel Lusk.
Bruce Turner, Baton Rouge, of counsel, for plaintiff-appellee Evelyn Higdon Blackburn.
J. B. Thompson, in pro per.
Before LANDRY, COVINGTON and PONDER, JJ.
COVINGTON, Judge.
This is a declaratory judgment action brought by Jessie Lusk Blackwell, Testamentary Executrix, seeking interpretation of the Last Will and Testament of Anna Lusk Jones dated March 20, 1972, which has been probated by the District Court in the probate proceedings. The Testamentary Executrix alleged that she was unable to deliver all of the legacies made in the will because of a number of ambiguities and uncertainties contained therein.
The facts in this case show that Anna Lusk Jones died on November 15, 1975, domiciled in East Baton Rouge Parish, Louisiana. Her husband, Benjamin A. Jones, predeceased her, as did her parents. The decedent had no children; and, therefore, she left no forced heirs. She was survived by one sister, Jessie Lusk Blackwell, the Testamentary Executrix, and the following children of predeceased brothers and a sister: Webster L. Lusk, Sr., Harry Upton Lusk, Jessie Lee Lusk Delahousaye, Alice Louise Lusk Johnson, Jefferson Lusk Smith, Joseph W. Lusk, Myrtle Lusk St. Pierre, Ethel Lusk, Mabel Lusk Kelly, Marion Lusk, Alfred Persac Lusk, and Sister Joseph Marie Lusk, all of whom were named parties defendant in the declaratory judgment action brought by the Testamentary Executrix. The suit also named Evelyn Blackburn, a legatee, and James B. Thompson, III, transferee in an Agreement to Sell, as defendants.
The petition set out that the will contained the following ambiguous and uncertain legacies:
A. "To my sister Jessie Lusk Blackwell, I leave my home and all the furnishings including my silver and china."
This legacy was said to be uncertain in failing to describe the amount and description of immovable property included in the word "home" and in failing to particularize what was included in the word "furnishings."
B. "To Webster Lytle Lusk Senior, I leave the home he is now living in on Hobgood Tract, from his driveway to the Comite River."
This legacy was said to be uncertain in failing to adequately describe the amount and description of the immovable property included in said legacy.
C. "To Mrs. Blackburn, I leave the house she is now renting from me with a frontage from my yard on the west sidecontaining a frontage to the property line bordering the land formerly owned by Albert LeBlanc et als."
This legacy was said to be uncertain in that Mrs. Blackburn (believed to be Evelyn Blackburn) was not renting from the decedent at the date of death and in that it failed to adequately describe the immovable property embraced within the legacy.
D. "(1) To Jessie Lusk Blackwell, I leave ten thousand dollars and all remaining cash after all my debts are paid.
"(2) To Jessie Lusk Blackwell, I leave all remaining property I own in City of Baton Rouge, La."
These two legacies were said to be uncertain as to their meaning and intent, particularly with respect to the property to which they are applicable, and with respect to the question as to whether or not the two legacies *1146 (considered together) amount to a universal residuary legacy.
The petition also inquired into the enforceability of a purchase agreement by setting out that there was uncertainty with respect to whether or not the Testamentary Executrix was required to initiate the appropriate steps to effect a transfer to James B. Thompson, III, of the balance of the property described in the Agreement to Sell between the decedent and James B. Thompson, III, dated April 25, 1972, even though the time stated for passage of the Act of Sale had expired.
As a collateral matter, it was alleged that the Testamentary Executrix needed advice as to what disposition was to be made of the proceeds of the sale if a sale was made, or what disposition was to be made of the immovable property if the sale was not made.
On the trial, the District Court rendered judgment declaring the rights of the parties and judicially interpreting the Last Will and Testament of Anna Lusk Jones as follows:

"1.
"The following legacy contained in the last will and testament of the decedent:
"`To my sister Jessie Lusk Blackwell, I leave my home and all of the furnishings including my silver and china.'
"be and the same is hereby decreed to include the following:
"a.) A certain tract or parcel of land, together with all of the buildings and improvements thereon, situated in the Parish of East Baton Rouge, State of Louisiana, in Section 44, Township 6, south range 1 east, containing 2.54 acres and being designated as `Tract Y-1' on a plan of survey, dated October 15, 1974, revised September 10, 1977, made by Shashikant C. Shah, registered professional engineer, which survey is entitled `A map showing the survey of a 162.91 acre tract known as the Anna Lusk Jones tract, and the division of the 157.96 acre portion being south of Joor Road into tracts X & Y, located in Section 44, T-6-S, R-1-E, Greensburg Land District, East Baton Rouge Parish, Louisiana'; the said parcel of land having such dimensions as is shown on said map
"b.) All of the contents of any nature or kind whatsoever which are located in the residence of decedent located upon the tract described in sub-paragraph (a) above.

"2.
"The following legacy contained in the last will and testament of the decedent:
"`To Webster Lytle Lusk, Senior I leave the home he is now living in on Hobgood Tract, from his driveway to the Comite River.'
"be and the same is hereby declared to include the following:
"A certain tract or parcel of land together with all of the buildings and improvements thereon situated in the Parish of East Baton Rouge, State of Louisiana, in Section 44, Township 6, south range 1 east, containing 152.47 acres and being designated as `Tract X' on the plan of survey dated October 15, 1974, revised September 10, 1977, made by Shashikant C. Shah, registered professional engineer, which survey is entitled `A map showing the survey of a 162.91 acre tract known as the Anna Lusk Jones Tract, and the division of the 157.96 acre portion being south of Joor Road into tracts X & Y, located in Section 44, T-6-S, R-1-E, Greensburg Land District, East Baton Rouge Parish, LA'; the said parcel of land having such dimensions as is shown on said map.
"The said legacy does not include `Tract Z' as shown on said map.

"3.
"The following legacy contained in the last will and testament of the decedent:
"`To Mrs. Blackburn I leave the house she is now renting from me with a frontage from my yard on the west side, containing a frontage to the property line bordering the land formerly owned by Albert LeBlanc, et als'.

*1147 "be and the same is hereby declared to be a legacy in favor of defendant, Evelyn Blackburn, and to include the following:
"A certain tract or parcel of land together with all of the buildings and improvements thereon, situated in the Parish of East Baton Rouge, State of Louisiana, in Section 44, Township 6, south range 1 east, containing 2.95 acres, and being designated as `Tract Y-2' on a plan of survey dated October 15, 1974, revised September 10, 1977, made by Shashikant C. Shah, registered professional engineer, which survey is entitled `A map showing the survey of a 162.91 acre tract known as the Anna Lusk Jones tract, and the division of the 157.96 acre portion being south of Joor Road into tracts X & Y, located in Section 44 T-6-S, R-1-E, Greensburg Land District, East Baton Rouge Parish, LA.'; said parcel of land having such dimensions as is shown on said map.

"4.
"The following legacy contained in the last will and testament of the decedent:
"`To Jessie Lusk Blackwell, I leave Ten Thousand Dollars and all remaining cash after all my debts are paid.'
"be and the same is hereby decreed to include the sum of Ten Thousand ($10,000.00) Dollars and, in addition, only the following:
"All other currency or coins, amounts on deposit in savings and loan associations, bank checking or savings accounts and bank time certificates of deposit, owned by the decedent at her death, together with any interest earned on any of the above from the date of the death of the decedent until delivery of the legacy, less and except any of said items or the revenue therefrom which has been or maybe required to discharge the debts of the decedent, special legacies, or charges of the succession. Shares of corporate stock and U.S. Savings Bonds are excluded from said legacy.

"5.
"The following legacy in the last will and testament of the decedent:
"`To Jessie Lusk Blackwell, I leave all the remaining property I own in the City of Baton Rouge.'
"be, and the same is hereby decreed to be restricted to immovable property actually located within the city limits of the City of Baton Rouge, Louisiana, and includes only the following:
"(1) A certain lot or parcel of ground together with all improvements thereon situated in that part of the City of Baton Rouge, Louisiana, known as Lorente Town, the said lot being designated according to the official map of the City of Baton Rouge, Louisiana, as Lot No. Eleven (11) Square No. Two (2) or Two Hundred Thirteen (213), measuring Sixty-four Feet (64') front on Champagne Street, by a depth between parallel lines of One Hundred Twenty-eight feet (128'), being the same property acquired by this vendor by donation Mortis Causa from Mrs. Leontine Nodler as will be seen by reference to proceedings had in the matter of the succession of the said Mrs. Leontine Nodler No. 3252 Probate Docket of the Nineteenth Judicial District Court of Louisiana.
"(2) A certain lot or ground, with the buildings and improvements thereon, situated in that part of the City of Baton Rouge known as Hickey Town, being Lot No. Two (2) of Square No. Twenty (20) or One Hundred Thirty (130), measuring Sixty-four (64) feet front on Convention Street by a depth of One Hundred Twenty (120) feet.
"(3) A certain lot of ground situated in Roselawn Memorial Park Parish of East Baton Rouge, and being the northwest quarter of lot number 191 in section number F, according to the plan thereof on file in the office of Roselawn Development Association and in the Office of the Clerk and Recorder of East Baton Rouge Parish, Louisiana.

*1148 "6.
"The following legacy contained in the last will and testament of the decedent:
"`The lot of ground I own on Florida St. and now rented by Goodyear Tire and Rubber Company, being leased to Goodyear for Fifteen years at Three Hundred Dollars per month, I leave to Jessie Lusk Blackwell.'
"be, and the same is hereby decreed to embrace the following described property to-wit:
"A certain lot of ground, with the buildings and improvements thereon, situated in that part of the City of Baton Rouge known as Hickey, Duncan and Mather Town, being Lot No. Four (4) of Square No. Five (5) or Ninety-seven (97), measuring sixty-four (64) feet front on Florida Street by a depth between parallel lines of One Hundred Twenty-eight (128) feet.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the last will and testament of the decedent fails to contain a residuary legacy and, hence, all property owned by decedent and not made the subject of specific legacies or which was the subject of any lapsed legacy, shall be inherited by the heirs at law of the decedent in the proportions provided by law.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant, James B. Thompson, III, be, and he is decreed entitled to enforce specific performance which he has demanded of that certain agreement to sell, dated April 25, 1972 and filed as original 44 of Bundle 8136 of the Records of the Clerk and Recorder for the Parish of East Baton Rouge, and, accordingly, the testamentary executrix be, and she is hereby authorized and directed to initiate and complete the proceedings necessary to convey the balance of the property embraced within said agreement to James B. Thompson, III, or his designees or assignees.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the consideration received by the executrix for the transfer of said property, mentioned in the preceding paragraph hereof, shall not be subject to the special legacy mentioned in Paragraph 4 hereinabove, but, on the contrary, after having been reduced by its proportionate share for payment of other special cash legacies, debts and charges of the succession, shall be distributed to the heirs at law of decedent in the proportions provided by law.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, good cause having been shown for an additional extension of time for filing of Louisiana Inheritance Tax Return and the paying of inheritance and the estate transfer taxes, if any, under the provisions of R.S. 47:2420, the time for filing such return and the fixing and paying of such taxes, without interest or penalty, is hereby extended to a date which shall be ninety days after the judgment in this declaratory judgment suit shall have become final.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all costs of this declaratory judgment proceeding shall be paid by the succession.
"JUDGMENT RENDERED AND SIGNED at Baton Rouge, Louisiana, on this 27th day of June, 1978.
 "/s/ Steve A. Alford, Jr.
 "JUDGE, NINETEENTH JUDICIAL
 DISTRICT COURT"
Appeals from this judgment were taken by Jefferson Lusk Smith, Jessie Lee Lusk Delahousaye and Alice Louise Lusk Johnson. Jessie Lusk Blackwell, the Testamentary Executrix, has also appealed; but in her brief on appeal, she takes the position that she is "simply in the nature of a stakeholder and stands ready to distribute succession property in accordance with the final judgment which may be rendered interpreting the last will and testament. Because of this fact, and in the interest of protecting the rights of those parties who did not plead, it was felt that the testamentary executrix should perfect an appeal so as to insure that the declaratory judgment, in its entirety, will be reviewed by the appellate court."
*1149 The cardinal rule in interpreting wills is that the intention of the decedent must be ascertained, and must be given effect, if this can be done without doing violence to the strict codal requirements concerning formalities. Carter v. Succession of Carter, 332 So.2d 439 (La.1976).
The basic principles applicable to the interpretation of wills are primarily set out in two articles of the Civil Code:
Article 1712: "In the interpretation of acts of last will, the intention of the testator must principally be endeavored to be ascertained, without departing, however, from the proper signification of the terms of the testament."
Article 1713: "A disposition must be understood in the sense in which it can have effect, rather than that in which it can have none."
In discussing the foregoing interpretative rules, the Supreme Court in Carter v. Succession of Carter, supra, said:
"Principally, courts must endeavor to ascertain the testator's intention. All other rules are only means to that end. Succession of La Barre, 179 La. 45, 153 So. 15 (1934); Succession of McBurney, 165 La. 357, 115 So. 618 (1928); Succession of Blakemore, 43 La.Ann. 845, 9 So. 496 (1891). The function of the court is to determine and carry out the intention of the testator if it can be ascertained from the language of the will. Succession of Wilcox, 165 La. 803, 116 So. 192 (1928). "`This intention must be ascertained from the whole will, and effect must be given to every part of the will as far as the law will permit. No part of a will should be rejected, except what the law makes it necessary to reject. Where it is a question of the choice between two interpretations, one of which will effectuate, and the other will defeat, a testator's intention, the court will carry out the intention of the testator.
"`There is also another rule which is invariably followed by the courts in interpreting a will; namely, that, if possible, the will should be read so as to lead to a testacy, not to an intestacy.' Succession of La Barre, supra 179 La. at page 48, 153 So. at page 16.
"In the absence of contrary expressions, the law presumes that when a will is executed the testator intends to dispose of his entire estate. Succession of Killingsworth, 292 So.2d 536 (La.1973); Succession of Montegut, 211 La. 112, 29 So.2d 583 (1947); Succession of Fertel, 208 La. 614, 23 So.2d 234 (1945). And the cases have recognized that in the interpretation of wills, the first and natural impression conveyed to the mind on reading the will as a whole is entitled to great weight. The testator is not supposed to be propounding riddles, but rather to be conveying his ideas to the best of his ability so as to be correctly understood at first view. Succession of La Barre, supra; Succession of Bobb, 41 La.Ann. 247, 5 So. 757 (1889)."
In order to ascertain the intention of the decedent, the language of the will must "be understood in its ordinary popular meaning and without attending so much to the niceties of rules of grammar." Succession of Price, 202 La. 842, 13 So.2d 240 (1943).
With the foregoing principles serving as guides to the interpretation of the will in the instant case, we now consider the questions posed by the Testamentary Executrix.
A(1). The meaning of "my home": The dictionary definition of "home" is "the house and grounds with their appurtenances habitually occupied by a family." See Webster's Third New International Dictionary. We have no difficulty in ascertaining that it was the intention of the testatrix, Anna Lusk Jones, to leave to her sister, Jessie Lusk Blackwell, the immovable property described by the trial court in its decretal portion, 1(a), of the judgment.
J. Russell Doiron, realtor who managed some of the real estate holdings of the decedent and her husband for over 40 years, testified as follows:
"A. Y-1 is the homeplace. And we have already described the division line, the property line between Y-1 and Y-2.

*1150 The Court: That is on the southeast line?
A. That's right. Then the front line of the property is on Joor Road. The upper line between the property of L.J. St. Pierre and the homeplace there is no fence line, but there is a planted area between the two that indicates the property line. It is sufficiently sharp enough that you can readily see that at the real line of the St. Pierre line there is an offset from what is the established property line between Y-1 and the St. Pierre property.
Q. How can you tell that: What features on Y_ _ _
A. There is a fencethere are two fences on the ground. There is a fence that runs a short distanceI am trying to identify it from whatever this point isthere is a fence parallel to Joor Road and there is also a fence with a gate from the rear portion of Y-1 in order to enter the area in Tract X, which we refer to as the pasture land.
Q. Let me see if I can get my directions straight. If you will start, please sir, at the southwest corner of the St. Pierre property. I guess that would be southwest, would it not?
A. This would be southwest.
Q. Which is labeled, Found 3/4 Rod? That point?
A. That would be it.
Q. From that point going in a generally southwest direction, is there a fence?
A. There is a fence.
Q. In that little short offset?
A. That's right. Then the fence makes a left-hand turn and goes to what we refer to as the LeBlanc property line. And this is wherein the rear area of this fence, close to the Le-Blanc property line is a large gate for access to the pasture land.
Q. Am I correct in saying that the only place that Y-1 is not separated from the St. Pierre property by a fenceI am sorry, from the rest of the property by a fence would be along the southwesterly line of the St. Pierre property?
A. That would be the area from Joor Road, a distance of 234.96 feet to the fence line along the rear of the St. Pierre property.
Q. Now is the St. Pierre property otherwise fenced so far as you know?
A. Only the rear line.
Q. The rear line. And what do you mean by the rear line?
A. That would be the line paralleling the southerly line paralleling Joor Road. There is no fence between Y-1 and the St. Pierre property in the area fronting Joor Road.
Q. Now are you familiar with the property that Mrs. Jonesthe residence that she actually occupied and the premises that she used as her yard?
A. Very definitely.
Q. Does Y-1 correctly represent that area so far as you know?
A. I am positive that it does.
Q. How many residences are there on that property?
A. Only one.
Q. That was where Mrs. Jones, herself, resided?
A. It was her home."
Mr. Doiron's testimony is corroborated by Webster L. Lusk, Sr., nephew of the decedent and one of the legatees, in his testimony, and by the testimony of Charles Harlan, land surveyor.
The foregoing extrinsic evidence was admissible to resolve the ambiguity in the meaning of "my home." See Giroir v. Dumesnil, 248 La. 1037, 184 So.2d 1 (1966); Succession of Smart, 214 La. 63, 36 So.2d 639 (1948).
In Giroir v. Dumesnil, supra, the Court said:
"When a will is ambiguous, the court uses extrinsic evidence to determine what the words of the testator as written actually mean. The evidence is used to resolve *1151 ambiguity, not to rewrite the will or do violence to its terms. The court seeks to lay bare the intention of the testator." (Emphasis by the Court).
In Succession of Smart, supra, the Court said:
"We see no merit in the appellants' contention that the will as a whole is so ambiguous that the intent of the testatrix cannot be determined. Where there is ambiguity in the description of the legatee, or the thing which the testatrix intended to bequeath, or the quantum or portion of the legatee, or where there is doubt as to the sense in which the words are used by the testatrix, resort may be had to extrinsic evidence. In fact, all circumstances throwing any light on the testatrix's intention must be considered."
We are buttressed in our opinion that "my home" means the entire home site conveniently and habitually used for the family purposes, and is not limited to the house and the land on which the house is immediately situated, by the decisions of Succession of Cardone, 271 So.2d 338 (La. App. 2 Cir. 1972), writ denied, 273 So.2d 300 (La.1973); Succession of Davis, 178 So.2d 481 (La.App. 1 Cir. 1965).
A(2). The meaning of "furnishings including my silver and china": The term "furnishings" is commonly understood as referring to the furniture, drapes, carpets and other household items with which a person's dwelling is furnished. See Succession of Cardone, supra. "Silver" is, of course, understood as meaning utensils, flatware, holloware and other table articles made of the metal "silver", used for serving food on special occasions. And, "china" means the dishes made of that material. The trial court treated the expression "all of the furnishings including my silver and china" as meaning "All of the contents of any nature or kind whatsoever which are located in the residence of the decedent" situated on the home site. We agree with this interpretation under the particular circumstances of this case. We do not mean to imply that in all cases "furnishings including my silver and china" would be synonymous with the "contents of a residence." Each case turns on its own peculiar facts and circumstances.
B. The meaning of "the home he (Webster L. Lusk, Sr.) is now living in on Hobgood Tract, from his driveway to the Comite River."
Mr. Doiron, the realtor-manager of the Jones property, was also quite familiar with this particular tract of land. It is a clearly identifiable tract, and has been used as a unit by Webster L. Lusk, Sr. for his place of residence and for raising cattle, for a period of about 25 years. In discussing this particular tract of land, Mr. Doiron testified as follows:
"Q. To what extent are you familiar, sir, with tract X? How long have you been familiar with it?
A. I have been familiar with Tract X since about 1940. Now I have not personally walked over all of Tract X. I have walked over part of it. The quad maps show that the greater portionlet me change that, that a great portion, probably 50% of Tract X is low land and subject to inundation.
Q. I notice just to the northeast of the St. Pierre tract and on Tract X is what purports to be an existing residence. Do you know who resides in that house?
A. Yes, that is the residence that is occupied by Mr. Webster Lusk.
Q. Do you know how long he has lived there to your knowledge, approximately.
A. I have a record of it. If memory serves me correctly, about 1953, I believe.
Q. Do you know who built the house?
A. Mr. Lusk built it.
Q. Do you know generally what use that property has been put to since the residence of Mr. Lusk was erected?
A. Cattle grazing.
Q. By whom?
A. By Mr. Lusk.

*1152 Q. Webster Lusk?
A. Mr. Webster Lusk.
Q. Now the will makes reference to a driveway by Mr. LuskI am not quoting it exactly, but do you know where Mr. Lusk's driveway is? Have you been on the grounds?
A. Many times.
Q. Can you use a pencil, if you would, and draw me, for meI would like for you to draw in on the map for melocate Mr. Webster Lusk's driveway.
A. Mr. Lusk's driveway comes in off of Joor Road somewhere in this area. It might be a little closer to the St. Pierre line than I am indicating.
Q. Well, does it adjoin the St. Pierre line, do you know?
A. I can't be positive. It is in the very close proximity of the St. Pierre property.
Q. Just give us the general location.
A. Then it comes in here and then it turns around and comes back out to Joor Road.
Q. Now would you just put an arrow and label that with the letter A. And that is your appreciation of the general location of Mr. Lusk's driveway?
A. Right.
Q. All right.
A. And as stated before, it is a very short distance from the St. Pierre property line and it could be less distance than would be indicated engineeringly by my sketch.
Q. Now as far as you know, has Mr. Webster Lusk for the years that you indicated actually raised cattle on the property?
A. Mr. Lusk has been on the property the entire period of time that I have known him. And he has been grazing cattle on this piece of land.
Q. And during all this period of land (sic) that Mrs. Jones actually occupied a residence on Tract I, Y-1?
A. Y-1, yes.
Q. Now, of course, I take it that you would not know the arrangements between Mr. Lusk and Mrs. Jones?
A. No, I never did investigate it, because Miss Anna handled that herself.
The Court: He has been living in there since the 1940's?
A. I have it in my records. I think though that Webster built that house about 1953. I believe I have it in my records.
Q. Now with respect to Tract Z, are you familiar with that area?
A. Yes. Back in the middle 50's the Louisiana Department of Highways rerouted Joor Road and built a new bridge over the Comite River. And in the rerouting they severed Tract X, which contained 4.95 acres.
The Court: You mean Z.
A. I mean Z. I am sorry. They severed Tract Z, which contained 4.95 acres from the larger tract which was across the new Joor Road."
Webster L. Lusk, Sr., testified as follows:
"Q. Now have you lived in the house continuously since you built it?
A. I have.
Q. Have you been a neighbor to Mrs. Jones continuously from the time you built the house until the time of her death?
A. I have. Let me inject this. My family had. I was away for 18 months on foreign assignment with the company but I maintained the home.
Q. Did you have somebody in it while you were gone?
A. Yes.
Q. Now, what was the extent of the property that you used, if any.
A. I used all of Tract X and Tract Z until such time as the highway reroute severing Tract Z from Tract X. I still had the property but there was never anything done on it.
Q. So as I understand it, you never, from the time that the highway severed *1153 Tract Z, you have never been on it or used it in any way. But is that the reason you haven't been on it?
A. On account of the highway going through.
Q. It was not practical?
A. It was only 4 or 5 acres and it is low land and I really couldn't use it for anything.
Q. Have you been in court and have you heard Mr. Doiron's testimony?
A. I heard Mr. Doiron's testimony.
Q. Did you see him indicate in pencil by the letter "A" the approximate location of your driveway?
A. I saw him in the act, that's right.
Q. Does that reasonably approximate the location of your driveway?
A. It does with the exception that it goes too far, I would say, south, just above the turning at the point and makes a turning closer to the house. It does not go as far east, past the location of the house.
Q. It does go behind your house?
A. Yes.
Q. About how far to the south of your house is it?
A. About a car's length. I would say about 30 feet would be the inside curve and turning point.
Q. Would it be true that it does not extend all the way to the section line between 44 and 47?
A. It does not extend that far.
Q. What use did you make of the property, Mr. Lusk?
A. I bought the cattle that Mrs. Jones had on the property.
Q. When did you buy her cattle?
A. I bought her cattle aroundoh, it would be 1944, around in 1944 I bought her cattle.
Q. You paid her for them?
A. I paid her for them. And I added to the herd and had cattle on the property until about 1955 or '56 when they widen (sic) the Comite River.
Q. And then what did you do with the cattle then?
A. Well, I started selling them off until I finally got rid of the herd, because I was having trouble with them, crossing the Comite River. And I didn't feel peaceful to fence it in. City-Parish wouldn't fence it in and there was no previous fence there.
Q. What, if any, did you make of the property after you sold your cattle?
A. I used it more or less as pleasure and hunting and fenced it down to the river.
Q. Were these uses that you made of the property with the knowledge and consent of Mrs. Jones?
A. Absolutely.
Q. Did you have any written agreement of any kind?
A. No written agreement.
Q. Now I believe that you testified that you heard Mr. Doiron's testimony in this case but I don't want to go over it all again.
A. Correct.
Q. Did you hear him testify about the fences and the hedge rows and the physical features that separate these tracts as shown on the map. Were you out there with Mr. Doiron and the surveyor when this map was prepared or when the work was done?
A. When the work was done I was there.
Q. Did you physically see the features that he described?
A. I did.
Q. Would you care to make any change in the testimony in that respect in any way? Are there any discrepancies that you detected at all?
A. No."
As appears from the survey of Shashikant C. Shah, registered professional engineer, dated October 15, 1974, the tract held by the lower court to have been bequeathed by the decedent to Webster L. Lusk, Sr., is a tract of land, designated as Tract X on *1154 said survey and comprises 152.47 acres, It is on this tract that Webster L. Lusk, Sr., has built his home and where he resides. This tract is situated northeasterly of the L.J. St. Pierre tract of 2.81 acres, and extends to the Comite River (which is one of the boundaries mentioned in the will of Mrs. Jones). From the testimony, it appears that this tract of land consists primarily of pasture land south or below Hobgood (or Jones) Creek, with the remainder being timber and swamp or lowlands. Mr. Webster Lusk kept cattle in the pasture (as had Mrs. Jones' husband) until about 1955 when the entire herd was sold. Thereafter, the actual occupancy has continued only in the nature of occasional pleasure hunting. There is a small garden plot not far from the residence and a horse pen to the rear of the garden plot. Only a small part of the property is fenced.
There was an earlier will left by Mrs. Jones, but it was admittedly revoked by the later will, which has been probated. This earlier will can, however, aid us in interpreting the last will and testament of the decedent. In the earlier will, Mrs. Jones left to her nephew, Webster L. Lusk, Sr., "a piece of land with all of the buildings and improvements thereon, that he is now occupying as a homethis piece of land to include a frontage on Joor Road from the Hobgood Tract of 400 feet beginning from the fence adjacent to and running along side of the driveway making a southwesterly boundary, and with a depth of 350 feet making a plot 400 feet front by a depth of 350 feet."
When the present bequest is considered in light of the earlier bequest (in 1962), it is clear that Mrs. Jones intended to bequeath "more land" to Mr. Lusk in her last will than she had in her 1962 will. We can not believe she would intend to merely leave him the same tract as she had earlier, and yet write in her will such a different description of the property, a description that encompasses the furthermost reaches of the tract of land (the Comite River), a welldefined geographical boundary. It also appears that the Hobgood Tract, less the portions that had been sold out or had been definitely set aside for other uses, was wellknown. The evidence established that Mr. Lusk treated the tract on which his residence was built as a unit, the area habitually used for family purposes, from his driveway to the Comite River.
C. The meaning of the Blackburn legacy. Although the bequest was made to a "Mrs. Blackburn," all of the witnesses were able to identify her as Evelyn Blackburn. The witnesses, particularly Mr. Doiron, were able to identify the particular property bequeathed to Evelyn Blackburn. It is of no consequence that Mrs. Blackburn was not actually renting from Mrs. Jones at the death of Mrs. Jones. The language "the house she is now renting from me, etc." identifies the property and does not impose a condition upon the bequest. The property is well delineated on the survey, and its boundaries pose no particular problem at this time. We agree with the trial judge that it was Mrs. Jones' intention to leave the property which Mrs. Blackburn occupied as a lessee or tenant in 1972 (when the will was written) to Mrs. Evelyn Blackburn.
D(1). The meaning of "Ten thousand dollars and all remaining cash after all my debts are paid."
From the evidence, the trial judge concluded that this bequest to Jessie Lusk Blackwell included "the sum of Ten Thousand ($10,000.00) Dollars and, in addition, only the following:
All other currency or coins, amounts on deposit in savings and loan associations, bank checking or savings accounts and bank time certificates of deposit, owned by the decedent at her death, together with any interest earned on any of the above from the date of the death of the decedent until delivery of the legacy, less and except any of said items or the revenue therefrom which has been or may be required to discharge the debts of the decedent, special legacies, or charges of the succession. Shares of corporate stock and U.S. Savings Bonds are excluded from said legacy." (Emphasis by the District Court.)
*1155 We agree with this conclusion. This interpretation is consistent with the definition of "cash" found in 14 C.J.S. p. 15 et seq. See also Succession of Bannon, 341 So.2d 623 (La.App. 4 Cir. 1977). A share of corporate stock is not cash in the sense "cash" is used in the decedent's last will; a share of stock is usually thought of as "a unit of interest in a corporation." See 18 Am.Jur.2d sec. 209, p. 737. For a discussion of the treatment accorded United States Savings Bonds in this State, see Succession of Guerre, 197 So.2d 738 (La.App. 4 Cir. 1967), writs refused, 250 La. 929, 199 So.2d 925 (1967) and 250 La. 933, 199 So.2d 926 (1967).
D(2). The meaning of "all remaining property I own in City of Baton Rouge, La."
This legacy is, as the trial judge held, "restricted to immovable property actually located within the city limits of the City of Baton Rouge, Louisiana." The property affected by the legacy is particularly described in the judgment. It appears that Mrs. Jones intended to leave to her sister all of her immovable property situated within the city limits of Baton Rouge, unless she had made a special legacy thereof.
One other parcel of land needs to be considered, although it presents no special problem, and that is the lot rented to Goodyear Tire and Rubber Company on Florida Street in Baton Rouge. Mr. Doiron was very familiar with this parcel of land; and from all of the evidence, there can be no question but that Mrs. Jones bequeathed this parcel, which is described in the judgment, to her sister, Jessie Lusk Blackwell.
There is one other question concerning the bequests in the will which we are called upon to answer, and that is whether or not Mrs. Jones intended to make Mrs. Blackwell her "universal residuary legatee" (although she did not specifically do so in the will). The trial court held that the last will and testament of the decedent failed "to contain a residuary legacy and, hence, all property owned by decedent and not made the subject of specific legacies or which was the subject of any lapsed legacy, shall be inherited by the heirs at law of the decedent in the proportions provided by law."
We agree with the trial judge that the last will and testament of Mrs. Jones does not contain a residuary legacy. Mrs. Blackwell was not named as Mrs. Jones' universal legatee. A universal legacy is a testamentary disposition by which the testator bequeaths to one or several legatees "the whole of the property which he leaves at his decease." LSA-C.C. art. 1606; Succession of Bannon, supra. Thus, the property of the decedent not made the subject of a specific legacy is inherited by the heirs at law of Mrs. Jones. LSA-C.C. art. 1709; see Oppenheim, Louisiana Civil Law Treatise, Successions and Donations, sec. 151, p. 269 (1973).
On appeal, it is urged that the trial court erred in its judgment decreeing that James B. Thompson, III, was entitled to specific performance of the agreement to sell, dated April 25, 1972, between the decedent and Thompson, and authorizing and directing the testamentary executrix to initiate and complete the proceedings necessary to convey the balance of the property embraced within the agreement to sell to James B. Thompson, III.
The record shows that on April 25, 1972, the decedent and Thompson entered into the subject agreement to sell, which agreement was duly recorded. By the terms of the agreement, Thompson was given six months within which to buy a minimum of 25 acres, and the balance of the acreage within three years of the date of execution of said agreement. Pursuant to the agreement, Mrs. Jones sold thirty-three acres to a corporation owned by Thompson. Thereafter, on April 7, 1975, there was an agreement entered into by the parties extending the time for taking title to the remainder of the property for an additional six months, to October 25, 1975.
Prior to October 25, 1975, the parties agreed to a second extension to December 31, 1975. The second extension was signed by Mrs. Blackwell on behalf of Mrs. Jones, *1156 but Mrs. Blackwell did not have a written power of attorney to execute the extension.
While we agree with the opponents that any extension in the time limit of the purchase agreement must be in writing. Burk Development Company, Inc. v. Guillory, 335 So.2d 512 (La.App. 1 Cir. 1976), we do not agree that the purchase agreement is unenforceable. The agreement to sell did not provide that time was of the essence, and there is no evidence outside of the contract that time was of the essence, particularly in light of the proposed extension in the time limit. Thus, as was held in Luna v. Atchafalaya Realty, Inc., 325 So.2d 835 (La.App. 1 Cir. 1976), the contract remained viable after the expiration of the time for transferring title, and either party is in a position to demand specific performance. Neither party was in default at the end of the contracted period, and either party could put the other in default.
For the foregoing reasons, the decision of the District Court is affirmed. We believe that a share of the costs should be borne by the succession, because the ambiguities in the last will and testament of the decedent necessitated judicial interpretation. Therefore, we cast the costs of this appeal on the appellant, Jessie Lusk Blackwell, as Testamentary Executrix of the succession, and appellants Jefferson Lusk Smith, Jessie Lee Lusk Delahousaye and Alice Louise Lusk Johnson, one-half to the succession and one-half to the other appellants.
AFFIRMED.