552 So.2d 799 (1989)
SUCCESSION OF Laurie J. HURST
v.
Charles GREMILLION.
No. CA 88 1649.
Court of Appeal of Louisiana, First Circuit.
November 15, 1989.
Emile Piazza, New Orleans, for plaintiff-appellant Gerald Leo Barattini.
*800 John Wayne Jewell, New Roads, for defendant-appellee.
Before EDWARDS, LANIER and FOIL, JJ.
FOIL, Judge.
This is an appeal from a declaratory judgment interpreting two legacies contained in the last will and testament of Laurie J. Hurst.
Laurie J. Hurst (decedent), a resident of Pointe Coupee Parish, Louisiana, died on March 17, 1987. Decedent left a last will and testament dated March 5, 1987, and a codicil thereto dated March 13, 1987. The will is in statutory form and provides, in pertinent part:
2. I will and bequeath to my wife, Sadie Hurst, the front portion of my homeplace from the False River and extending to the back fence which separates the front part of my property from the back portion. This includes the buildings and furniture in my residence.
4. I will and bequeath to Charles Gremillion, son of Ford Gremillion, that part of my property less the part willed to my wife.
The codicil provides as follows:
1. I will and bequeath to my wife Sadie Hurst all the mineral rights and royalty in and to the whole of my property on False River in the Parish of Pointe Coupee.
2. In all other respects my last will and testament is to remain in true force and effect.
Decedent's wife, Sarah Bileci Hurst, as administratrix of decedent's succession, filed suit against the legatee, Charles Gremillion, seeking a declaratory judgment interpreting the above particular legacies. Mrs. Hurst subsequently died on January 15, 1988, and her nephew, Gerald Leo Barattini, was substituted as party plaintiff after qualifying as executor of decedent's estate. After a hearing, the trial court interpreted the legacies in favor of defendant, and plaintiff brings the instant appeal. Plaintiff claims the trial court erred in:
1. Allowing a magnitude of hearsay and extraneous testimony;
2. Granting a judgment in clear violation of La.Civil Code art. 1712;
3. Disregarding the clear language of the last will and testament;
4. Disregarding the clear intent of the decedent testator;
5. Rewriting the will by disregarding the meaning of certain words: "buildings" and "back fence";
6. Interjecting the court's intent to be that of the testator;
7. In essence, rewriting the will of testator decedent; and
8. Granting a judgment giving appellee 75% interest in 35.75 acres instead of 12 acres, which is an excessive amount.
We find no merit to these claims and affirm the judgment of the trial court.

FACTS
Decedent was the owner of a narrow but deep tract of land on False River. On the front of the tract is a fairly new brick home which the Hursts used as their residence. The home sits nearby and faces La. Highway 1. A chain link fence spans the width of the front yard along the highway, as well as behind the house at the rear of the "back yard." There is also a garage/shop behind the residence. This portion of the property containing the residence and "front and back yards" consists of 1.72 acres. Behind the second chain link fence lies the land in dispute in this case23.75 acres. At one time the area was used as pastureland for cattle, but now contains a pecan orchard. Situated on this piece of land is a barn and an old house where decedent was born and raised. At the rear of this area are two barbed-wire fences spanning both sides of the Portage Canal, which traverses the property. Behind the canal lies 12 acres of swampy, wooded land. See Appendix A for a simplified, not-to-scale sketch of the above described tract of land.
Plaintiff/appellant, the succession representative, contends Mr. Hurst intended to convey to Mr. Gremillion only that portion of his property lying to the rear of the *801 Portage Canal (12 acres). On the other hand, Mr. Gremillion contends that Mr. Hurst intended to convey to him all of the property situated behind the chain link fence at the rear of his back yard (35.75 acres). Thus, the following questions were presented to the trial court: 1) When decedent used the term "back fence", to which fence was he referring?; and 2) To what areas was decedent referring when he used the terms "front portion of my homeplace" and "back portion"? The trial court agreed with Mr. Gremillion and found the "back fence" to be the fence behind the residence and yard area, which constitutes the "front portion of the homeplace." We agree.

INTERPRETATION OF WILLS
The basic principle applicable to the interpretation of wills is set out in the following article of the Louisiana Civil Code:
Article 1712. In the interpretation of acts of last will, the intention of the testator must principally be endeavored to be ascertained, without departing, however, from the proper signification of the terms of the testament.
The function of the court is to determine and carry out the intention of the testator if it can be ascertained from the language of the will. This intention must be determined from the will as a whole, which includes all of the clauses of the will and its codicils. Carter v. Succession of Carter, 332 So.2d 439, 441 (La. 1976); Younger v. Melton, 290 So.2d 410, 414 (La.App. 2d Cir.1974). It is established that in the interpretation of wills, the first and natural impression conveyed to the mind on reading the will as a whole is entitled to great weight. The testator is not supposed to be propounding riddles, but rather to be conveying his ideas to the best of his ability so as to be correctly understood at first view. Carter, 332 So.2d at 442.
With respect to ascertainment of the testator's intent, the Louisiana Civil Code further provides:
Article 1715. When, from the terms made use of by the testator, his intention can not be ascertained, recourse must be had to all circumstances which may aid in the discovery of his intention.
Thus, where there is ambiguity in the description of the legatee, or the thing which the testator intended to bequeath, or the quantum or portion of the legacy, or where there is doubt as to the sense in which the words are used by the testator, resort may be had to extrinsic evidence. In fact, all circumstances shedding any light on the testator's intention must be considered. Succession of Smart, 214 La. 63, 36 So.2d 639, 641 (1948). The court uses extrinsic evidence to determine what the words of the testator, as written, actually mean. It is important to note that such evidence is used solely to resolve ambiguity, not to rewrite the will or do violence to its terms. Succession of Jones, 369 So.2d 1143, 1150-1151 (La.App. 1st Cir.1979), writ denied, 373 So.2d 526 (La.1979); Succession of Cardone, 271 So.2d 338, 340-341 (La.App. 2d Cir.1972), writ denied, 273 So.2d 300 (La.1973). With these principles serving as guidelines to the interpretation of the will in this case, we shall consider the questions presented by plaintiff.
Here, the decedent bequeathed to his wife the "front portion" of his "homeplace" and made reference to the "back fence" which separates the "front portion" from the "back part" of his property. As there are several fences on decedent's property and three distinct sections of the property, we conclude the language, as used in this particular case, is ambiguous. Therefore, the trial court correctly resorted to extrinsic evidence in its effort to discern the intention of the testator. The following extrinsic evidence, pertinent to the issues before us, was introduced at the hearing:
Wilfred Aguillard was decedent's next door neighbor for approximately thirty-five years. He testified that the area behind the canal was a swamp with some woods on it. He further stated that decedent referred to the area within the chain link fence (the fence surrounding the brick home) as his "front yard."
*802 Decedent was aided in the preparation of his will and codicil by an attorney, J. Thomas Jewell. Mr. Jewell testified that decedent expressed his desire that his wife have the house and the property from the fence in back of the house to the fence along the road. Mrs. Hurst was present and stated she would also like to have the riverbank, which decedent agreed to. Mr. Jewell testified that the way the will was written before the codicil, Mr. Gremillion was getting most of the property and would thus get all of the royalties therefrom. After this was pointed out to him, decedent requested that the will be changed so that his wife would get the royalties from all of the property. That is why the codicil was made several days later.
Mr. Jewell further testified that there was a question about which fence he was referring to at the writing of the will, so decedent requested a piece of paper and a pencil to demonstrate what he meant. The piece of paper written on by decedent was introduced into evidence at the hearing. Although of poor quality and hard to read, the drawing purported to illustrate the fence in question. In pertinent part, decedent drew a vertical line on the left side of the paper. To the left of this line he wrote the words "front yard." To the right of the line he drew a second vertical line and wrote the word "fence" by it. To the right of the second line, he wrote the word "field." He drew a horizontal line from the words "front yard" through the first vertical line into the middle section between the two vertical lines.
Margie Hurst, whose husband was decedent's cousin, lived one mile from decedent for twenty-five years. Margie Hurst testified that she had numerous conversations with decedent about his desire to make a will and what he wanted to do with his property. Decedent indicated to her that he wanted to leave the pasture and the pecan trees to Charles Gremillion because Charles had been taking care of the property and he wanted it maintained and cared for in the same fashion. Decedent's wife, Mrs. Hurst, was aware of this and consented to it. Margie Hurst witnessed the execution of decedent's will. She testified that Mrs. Hurst was also present and understood that decedent was giving the field with the pecan trees on it to Mr. Gremillion. Mrs. Hurst consented to this disposition. When questioned about her familiarity with the land behind the Portage Canal, Margie Hurst replied that she was not too familiar with the "swamp part of the place."
Defendant, Charles Gremillion, testified that he helped decedent take care of his property for fifteen to twenty years, being occasionally compensated for his services. He did not go beyond the canal at the rear of the field because it could not be crossed since there is no bridge. The property behind the canal is woodland that nothing could be done with.
Plaintiff, Gerald Barattini, went to care for his aunt, Mrs. Hurst, after the death of decedent. Mrs. Hurst was in failing health. Mr. Barattini testified that it was Mrs. Hurst's understanding that Mr. Gremillion was supposed to get only the land behind the canal.
Several witnesses testified that decedent took great pride in his property. He was very meticulous and kept the pecan orchard as clean and well-groomed as a lawn.
In oral reasons for judgment, the trial court in this case found that decedent intended to give his wife the portion of the property within the chain link fence surrounding the residence, or "homeplace". He further intended to give Mr. Gremillion the portion of the property behind the second chain link fence, which would include the pecan orchard. The trial court stated its belief that, due to her illness, decedent did not want his wife to be burdened with the upkeep on the back portion of the property. He was happy with the way Mr. Gremillion took care of the property, so he left it to him. The portion of the property behind the canal is overgrown and not maintained. It would not have been a gift to Mr. Gremillion, but, instead, a burden. The trial court found the codicil supported this interpretation. Since Mr. Gremillion was receiving the back portion of the property which is much larger than the front *803 portion, decedent wanted to make sure his wife received the royalties from both portions. Finally, with respect to the simple drawing made by decedent, the trial court took notice of the fact that decedent only depicted two fences in the drawing (represented by the two vertical lines drawn). The court stated that decedent knew his property well, and if he had intended to give Mr. Gremillion a different portion of land, he "could have drawn a third fence or a fourth fence for that matter ..." (obviously, to represent the barbed-wire fences on each side of the Portage Canal).
After considering the testimony of the various witnesses, the documents presented in evidence, the jurisprudence and applicable statutory law, we conclude that the trial court was correct in its interpretation of the testator's intent in this case. This interpretation is in conformity with the first and natural impression conveyed to our minds on reading the will as a whole. In addition to the trial court's findings, we note that the Portage Canal is a well-defined, well-known geographical boundary in decedent's area. We believe that had he intended to leave Mr. Gremillion only the 12 acres of swampy, wooded land, he would have used the word "canal" instead of "back fence" to designate the separation between the "front portion" and "back part" of his property. The trial court's interpretation, in favor of defendant, Charles Gremillion, is reasonable, considering all of the provisions of the will, as well as the extrinsic evidence presented.
Accordingly, the judgment of the trial court is affirmed at appellant's cost.
AFFIRMED.
*804